CONNORS v. LONG ISLAND R. CO.

(Supreme Court, Appellate Division, Second Department. March 15, 1912.)

1. RAILROADS (§ 350*)—CROSSING ACCIDENTS—JURY QUESTIONS—NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE.

In an action against a railroad company for injury to the driver of a vehicle in a highway crossing accident, questions of negligence and contributory negligene *held* under the evidence for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.*]

2. EVIDENCE (§ 131*)—ADMISSIBILITY—REMOTENESS—WEATHER CONDITIONS.

On an issue whether it was foggy at a certain time and place in New York City, it was not error to admit testimony of a district forecaster

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

of the United States Weather Bureau, whose observations were taken at another place in the city, based on his records; no objection having been made because the records were not introduced, and the question of remoteness of the place of observation from the particular place going to the weight rather than to the admissibility of the evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 399–402; Dec. Dig. § 131.*]

Appeal from Trial Term, Kings County.

Action by James Connors against the Long Island Railroad Company. From a judgment for plaintiff and from an order denying a new trial, defendant appeals. Affirmed.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, WOODWARD, and RICH, JJ.

William C. Beecher, for appellant.

Jacob Rieger, for respondent.

JENKS, P. J.   The scene of the accident was where Neck Road, a highway in that part of the city of New York known as Sheepshead Bay, crossed over the double surface track of the steam railway of the defendant.   About 12:30 p. m. on November 25, 1910, the plaintiff was driving a brewery wagon drawn by two horses along that highway.   The wagon, 15 feet long, weighed 4,000 pounds, and its load weighed about 4,800 pounds.   When the plaintiff attempted to pass over the crossing, the hind wheel of his wagon was struck by the train coming upon the further track, and the plaintiff was injured. There was neither signalman nor gate nor other means of warning at the crossing.   Before collision the engineer saw the wagon, and the plaintiff saw the oncoming train.   There was no dispute that the engineer of the train blew his whistle before the collision, but the question of negligence tried was whether that signal was given at a proper time.   The plaintiff testifies that the whistle was not blown until he was upon the track with the horses, that he heard it first when he was between the two tracks, that the train was then about 95 yards to 300 feet away, and that it came upon him in about 6 seconds.   Plaintiff's witness Nies, who was standing in the doorway of her house near by, with a clear view of the track in either direction, had her attention attracted by the train.   She saw the wagon coming across.   The train made one loud whistle when "just a little past" her house.   This was the only whistle, and there was no other signal. At the time the whistle was blown, the wagon was "not quite on the railroad track," but "was just coming along the road."   When the whistle was blown, the wagon started to cross.   There was "just about half of the wagon on the track" when the whistle was blown, and 4 or 5 seconds thereafter there was collision.   It is true that her testimony is not entirely clear as to whether the whistle was blown before the plaintiff started to cross or when he was in the act of crossing.   The mother of this witness testifies that a succession of shrill whistles began at a point opposite her house, which is 250 or 275 feet distant from the crossing, and that within a few seconds her daughter called out to her that "a man was flying through the air."

Mrs. Rennie, a neighbor of the last witness, who was in the yard of her house, heard the whistle, looked up, saw the train coming "very fast," looked towards the crossing, and before she "could think" the train struck the wagon. The horse and wagon were coming across— were on the track about halfway over.

For the defendant, Mrs. Archer, a resident near by, testified she was in her hallway when she heard the crossing whistle, two long and two short whistles, followed by "a kind of danger whistle," so that she ran to her doorway. The whistle was blown before the train reached her house, but she could not estimate how long before; it might have been "a second or so." The train was coming very fast, and after she stepped back to take her coat from a rack to put about her, she saw the man and barrels descending in air. She had not seen the location of the plaintiff when the whistle was blown.

The engineer of the train testifies that he sounded the crossing whistle before he came to these houses. He remembered the situation of the whistling signal post, and he sounded the crossing whistle before he came to the post. His automatic bell was ringing. He further testifies that when he saw the plaintiff's team it was about 60 feet from the crossing, whereupon he blew a good warning whistle, which differs from a crossing whistle in being continued as long as possible. The man kept "right on going," and the witness applied the emergency brake. He had never measured the distance of the whistling signal post from the crossing, but judged it to be 400 feet or more; but he could not estimate between 300 and 500 feet. He finally placed that post from 100 to 50 feet the other side of these houses occupied by the said witnesses respectively, and then he indicated that location upon the map by pencil mark. He further testifies that there was another wagon driving upon the Neck Road on the opposite side. He blew his whistle to warn the driver of it, who stopped, and meanwhile the brewery wagon came along, and the witness kept blowing, but plaintiff never paid any attention. He put his hand on the brake when he saw the front wagon, in readiness to use it, and he first tried to stop the train when he saw the plaintiff was not going to stop. His train was traveling about from 20 to 25 miles an hour.

The fireman of the train did not see the accident. He was attending the fire, "paying no more attention than I ever did while approaching this crossing to notice whether the whistle was blown," "because that is the usual signal all the time"; but he heard a sudden, sharp whistle, the emergency brake was applied, he was flung against the boiler, and when the train was stopped he learned of the accident. The trainman at the end of the train noticed the crossing whistle and thereafter one long whistle, but he could not tell exactly at what point the first whistle was given. A civil engineer testified that the said houses were distant from 300 to 345 feet from the crossing, that the whistling post was about 1,390 feet from the crossing, that such a post should not be nearer a crossing than 1,320 feet, and that there was no whistling post at the place indicated on the map by the locomotive engineer. It was conceded that the tracks were straight away for one-half a mile. There was evidence not undisputed, however, that it was a damp, heavy, foggy morning.

[1] I think that the questions of negligence and contributory negligence were submitted properly to the jury. It could have found that the defendant omitted to give any signal at a distance from the highway crossing greater than 400 or 500 feet. The testimony of the engineer that he whistled at the whistling post is much affected by his own testimony that located that post "right opposite the houses," or "just the other side of the houses, something like 100 feet, maybe 50 feet." The plaintiff was traveling on the highway at a lively walk, but stopped his horses when their heads were 10 feet from the track. He looked in both directions and listened, but neither saw nor heard any train. He then "stirred up" his horses "lively," to get them over the tracks, and had almost passed over the further track at the time of the collision. At the stopping point he was "bothered" by the trees and shrubbery so that he could not see further than 50 or 60 or 70 yards. When he passed the trees he had a clear view right down the center of the track; but he testifies that he could only see the engine at the time the whistle was blown, when it was about 300 feet away, and when he was between the tracks. There is evidence, as I have said, that it was a damp, foggy day. It is not incredible as matter of law that he could not have seen the train in time to have prevented collision. The mere fact that it might have been possible for him to do so after his stop and when he stirred up his horses to cross the track would not defeat his action; but the question remains whether at the time he exercised due care under all of the circumstances. Parsons v. N. Y. C. & H. R. R. R. Co., 113 N. Y. 355–364, 21 N. E. 145, 3 L. R. A. 683, 10 Am. St. Rep. 450. The case is different from those where the plaintiffs have testified that they looked from a clear viewpoint of safety under bright atmospheric conditions and yet did not see what must have been patent to any one.

[2] It is insisted that the court erred in admitting the evidence of the district forecaster of the United States Weather Bureau, whose observations were taken at 160 Broadway, New York City. He testified that foggy weather was recorded both by instruments and by eye observations, that the horizon beyond Coney Island (which is in the general neighborhood and from the viewpoint of such an observer is beyond the scene of the accident) would be visible to his observers, and that if it was cloudy there it could not have been clear at the point of observation, that a fog could be at one place and not at another, that he could tell whether there would be any fog at Coney Island within a reasonable degree of certainty. He then proceeded to describe the atmospheric conditions of the day, and testified that the weather was foggy all day; the fog ranging from light to dense at different parts of the day. On motion made to strike out his testimony, without specification of the objection, the court decided that it should stand for what it was worth, under exception. The records of the Weather Bureau are prima facie evidence. Section 944, Code of Civil Procedure. The witness testifies that he could state the weather conditions within the territory and with reference to the particular locations therein with reasonable certainty, and then proceeds to give the facts drawn from the record, without objection that the record was not itself put in. The question of remoteness went to the weight of the evidence.

Mears v. N. Y., N. H. & H. R. R. Co., 75 Conn. 171, 52 Atl. 610, 56 L. R. A. 884, 96 Am. St. Rep. 192. See, too, Central R. R. & B. Co. v. Ingram, 98 Ala. 395, 12 South. 801.

I advise that the judgment and order be affirmed, with costs. All concur.